**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, INC., NATIONAL RIFLE ASSOCIATION OF AMERICA, SECOND AMENDMENT FOUNDATION, NEW MEXICO FIREARMS INDUSTRY ASSOCIATION, NEW MEXICO SHOOTING SPORTS ASSOCIATION, CALIBERS SHOOTING SPORTS CENTER, OMNI TACTICAL USA, RIGHT TO BEAR ARMS, and PETER HACKETT,<br><br>*Plaintiffs*,<br><br>v.<br><br>RAÚL TORREZ, in his official capacity as Attorney General of New Mexico,<br><br>*Defendant*. | Civil Action No. 26-CV-3514 |

**PLAINTIFFS' COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

The National Shooting Sports Foundation, Inc. ("NSSF"), the National Rifle Association of America ("NRA"), the Second Amendment Foundation ("SAF"), New Mexico Firearms Industry Association ("NMFIA"), New Mexico Shooting Sports Association ("NMSSA"), Calibers Shooting Sports Center ("Calibers"), Omni Tactical USA ("Omni Tactical"), Right to Bear Arms, and Peter Hackett (collectively, "Plaintiffs") bring this civil action seeking declaratory and injunctive relief against Raúl Torrez, in his official capacity as Attorney General of New Mexico. Plaintiffs allege the following based on personal knowledge as to all facts relating to them, and on information and belief as to all other matters.

## INTRODUCTION

1. Plaintiffs regret that they have been left with no choice but to file this lawsuit.

2. In 2024, New Mexico enacted House Bill 129, codified at N.M. Stat. §30-7-7.3, which forces prospective firearm purchasers who have already passed the comprehensive background check required by federal law to wait out an additional, multi-day "cooling off" period before taking possession of a firearm. We refer to the law as HB129.

3. In 2025, the United States Court of Appeals for the Tenth Circuit issued a published and precedential opinion "holding that [HB129] is unconstitutional," "both facial[ly] and as-applied," "except as to … those whose background checks are not cleared within three days." *Ortega v. Grisham*, 148 F.4th 1134, 1155-56 & n.16 (10th Cir. 2025). New Mexico sought *en banc* review of that holding, and was turned down by a vote of 10-2. 162 F.4th 1056 (10th Cir. 2025) (per curiam).

4. Two months ago, on remand from the Tenth Circuit, the District Court in *Ortega* "grant[ed]," without reservation, the *Ortega* plaintiffs' motion for summary judgment, *Ortega v. Grisham*, No. 1:24-cv-00471 (D.N.M. Aug. 26, 2026), Dkt.126 at 3, which asked for the entry of judgment "declaring that HB129 is unconstitutional as applied to individuals who pass the background check required under federal law," *Ortega*.D.Ct.Dkt.120 at 7.

5. That should have been the end of any contention by New Mexico that it can continue enforcing HB129. When the Court of Appeals in which a state sits deems a state law "obviously unconstitutional," *Ortega*, 148 F.4th at 1155 n.16; *see also id.* at 1155 n.15 (characterizing the constitutional violation as "broad and clear"), and a District Court enters final judgment memorializing the Court of Appeals' "holding that [the state law] is unconstitutional," *id.* at 1156; *see Ortega*.D.Ct.Dkt.126 at 2-3, state officials are supposed to follow suit. *See* N.M. Const. art. XX, §1 (New Mexico oath of office obligating officials to "support the [C]onstitution").

6. Unfortunately, New Mexico does not seem to get the message. Because the only plaintiffs in the *Ortega* case were two individuals, the New Mexico Department of Justice has taken the position that it may continue applying to everyone else in New Mexico a law that the Tenth Circuit has declared "obviously unconstitutional," *Ortega*, 148 F.4th at 1155 n.16. *See, e.g.*, Patrick Lohmann, *Federal Judge Rules Against New Mexico's 7-day Waiting Period for Gun Purchases*, SourceNM (Aug. 28, 2026), https://perma.cc/7U44-5SP9 ("[T]he order only states that the two named plaintiffs are able to purchase firearms without having to go through the waiting period. The law remains in effect otherwise." (quoting official from the Governor's office)). Both in public and in private, state officials have said in no uncertain terms that buyers and sellers who fail to comply with New Mexico's unconstitutional law should be prepared to face criminal charges in state court.

7. Plaintiffs are leading Second Amendment advocacy organizations, multiple federally licensed firearms dealers in New Mexico, and a former law enforcement officer with concrete plans to purchase a firearm in the coming days. Although Plaintiffs always view litigation as a last resort, New Mexico has made clear that it will not abide the Tenth Circuit's "holding" unless and until a court makes it do so. So Plaintiffs seek an order that once again declares HB129 unconstitutional in the context of firearms sales to individuals who pass the background check required under federal law and that enjoins New Mexico from enforcing the law against them, their customers, and their members. Plaintiffs also seek a monetary award under 42 U.S.C. §1988 for the attorneys' fees and costs associated with bringing this litigation.

## JURISDICTION AND VENUE

8. The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343 because Plaintiffs allege that HB129 violates the United States Constitution and seek relief under 42 U.S.C. §1983.

9. Venue is proper in this District under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claim occurred here.

**PARTIES**

10. Plaintiff **NSSF** is a non-profit, tax-exempt, non-stock corporation with its principal place of business in Shelton, Connecticut. It serves as the leading trade association for the firearm, ammunition, and hunting and shooting sports industries, with a membership of nearly 10,000 that includes manufacturers, distributors, and retailers of firearms, ammunition, and related products, including manufacturers and retailers based in New Mexico. NSSF's mission is to promote, protect, and preserve hunting and shooting sports by addressing industry challenges; to advance participation in and understanding of hunting and shooting sports; to reaffirm and strengthen its members' commitment to the safe and responsible sale and use of their products; and to promote support for America's traditional hunting and shooting heritage and firearm freedoms. NSSF is also a committed law-enforcement partner. Among other things, it has for decades (and across multiple Administrations) collaborated with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") on an anti-straw-purchasing campaign known as "Don't Lie for the Other Guy." *See NSSF, ATF Celebrate 25 Years of Partnership*, NSSF (Sept. 15, 2025), https://perma.cc/WYS9-FYN8. It also partners with ATF to deter and prevent "smash-and-grab" burglaries and robberies of firearm retailers through a program known as "Operation Secure Store." *See Operation Secure Store*, NSSF (2026), https://perma.cc/ZV4A-3PKF. NSSF has standing to bring this case "as the representative of its members"—including, but by no means limited to, Plaintiffs Calibers, Omni Tactical, and Right to Bear Arms—facing a credible threat of prosecution under it. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). NSSF also has standing to bring this case "in its own right," *id.*: New Mexico's position that HB129 remains in full force and effect notwithstanding the Tenth Circuit's

mandate and Judge Browning's declaratory judgment has forced NSSF to divert resources away from the initiatives described above and, consistent with its mission, devote significant resources to helping New Mexico-based members weather the substantial uncertainty that currently surrounds HB129's enforceability. That uncertainty is also likely to result in fewer gun sales, and thus a loss of NSSF membership dues, which will negatively impact NSSF itself.

11. Plaintiff **NRA** is a membership organization and non-profit devoted to protecting the right to keep and bear arms. Founded in 1871, the NRA is America's oldest civil rights organization and America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. The NRA has millions of members across the Nation, including thousands of members throughout New Mexico. Protecting the Second Amendment rights of its members is germane to the NRA's organizational purposes. NRA brings this action on behalf of its members—including, but by no means limited to, Plaintiff Peter Hackett—who have and will continue to be adversely and directly harmed by New Mexico's threatened enforcement of HB129.

12. Plaintiff **SAF** is a nonprofit educational foundation incorporated in 1974. SAF's mission is to preserve the individual constitutional right to keep and bear arms through public education, judicial, historical, and economic research, publishing, and legal-action programs focused on the civil right guaranteed by the Second Amendment to the United States Constitution. Protecting the Second Amendment rights of its members is germane to the NRA's organizational purposes. SAF brings this action on behalf of its members—including, but by no means limited to, Plaintiff Peter Hackett—who have and will continue to be adversely and directly harmed by New Mexico's threatened enforcement of HB129.

13. Plaintiff **NMFIA** is a non-profit organization based in Albuquerque, New Mexico that exists to protect, preserve, and promote the state's firearms industry by supporting New

Mexico gun store owners and federally licensed firearms dealers. It does this by advocating for the industry, working with its membership to ensure firearms stay out of the wrong hands, encouraging recreational shooting and hunting in New Mexico, and helping people better understand the firearms industry's lawful products. NMFIA brings this action both on its own behalf and also on behalf of its members—including, but by no means limited to, Plaintiffs Calibers Shooting Sports Center, Omni Tactical USA, and Right to Bear Arms—whose business operations have and will continue to be adversely and directly harmed by New Mexico's threatened enforcement of HB129.

14. Plaintiff **NMSSA** is the official state association of the NRA. NMSSA's mission is to support and defend the Second Amendment through education, advocacy, and community engagement, while promoting safe and responsible firearm use. NMSSA has thousands of members across the State of New Mexico. NMSSA brings this action on behalf of its members—including, but by no means limited to, Plaintiff Peter Hackett—who have and will continue to be adversely and directly harmed by New Mexico's threatened enforcement of HB129.

15. Plaintiff **Calibers** is a firearms-related retail business and federally licensed firearms dealer with two gun store locations in Albuquerque, New Mexico.

16. Plaintiff **Omni Tactical** is a firearms-related retail business and federally licensed firearms dealer located in Albuquerque, New Mexico.

17. Plaintiff **Right to Bear Arms** is a firearms-related retail business and federally licensed firearms dealer located in Albuquerque, New Mexico.

18. Plaintiff **Peter Hackett** is a former law enforcement officer who served over twenty years with the Albuquerque Police Department. He currently holds a Q clearance (equivalent of a "Top Secret" clearance) with the United States Department of Energy and the Nuclear Regulatory

Commission. He is a law-abiding citizen and is fully cleared to possess firearms in the state. Mr. Hackett intends to purchase a Glock 21 Gen 5 MOS semiautomatic pistol for self-defense purposes on or about October 24, 2026, from the Right to Bear Arms gun store located in Albuquerque. When he does so, he will be unable to acquire the firearm for seven days because of HB129.

19. Defendant **Raúl Torrez** is the Attorney General of New Mexico. In that capacity, Attorney General Torrez has responsibility to "prosecute … in any … court or tribunal all actions and proceedings, civil or criminal, in which the state may be a party." N.M. Stat. §8-5-2(B); *see also id.* §8-5-3. As a named party in *Ortega*, he is bound by the judgment in that case. He is also bound by oath to "support the [C]onstitution of the United States." N.M. Const. art. XX, §1. Attorney General Torrez is a resident of New Mexico, and he maintains an office in this District. At all relevant times, Attorney General Torrez, as well as those subject to his supervision, direction, or control, are and will be acting under color of state law. Attorney General Torrez is sued in his official capacity.

## BACKGROUND

### I. Laws Mandating Cooling-Off Periods For Firearm Purchases Are A Late-Twentieth-Century Innovation That Remain Uncommon Today.

20. The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

21. From the Founding to the present, federal and state authorities have grappled with the best way to respect that fundamental, pre-existing right while keeping firearms out of the hands of those who pose a credible threat to the physical safety of others. In "the early days of the Republic," however, there was no "open, widespread, and unchallenged" practice, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 36 (2022) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)), of imposing a waiting period before someone

could take possession of a firearm. *See, e.g.*, *Silvester v. Harris*, 41 F.Supp.3d 927, 962 (E.D. Cal. 2014) ("[T]here is no evidence to suggest that waiting periods imposed by the government would have been accepted and understood to be permissible under the Second Amendment.").[1] To the contrary, courts recognized from the very beginning that "the right of the people to keep and bear arms" "necessarily involves the right to purchase and use them in such a way as is usual" whenever the need to do so arises. *Andrews v. State*, 50 Tenn. 165, 177-78 (1871).

22. Waiting-period provisions first came onto the scene in the early twentieth century, around the same time that some states started adopting various types of background checks. *See Silvester v. Harris*, 843 F.3d 816, 831 (9th Cir. 2016) (Thomas, C.J., concurring); *Rocky Mt. Gun Owners v. Polis*, 701 F.Supp.3d 1121, 1137 (D. Colo. 2023) ("[N]o law requiring a waiting period was enacted in the United States until 1923."); David B. Kopel, *Background Checks for Firearms Sales & Loans: Law, History, and Policy*, 53 Harv. J. Leg. 303, 360 (2016) (same). These waiting periods were designed to facilitate the background-check process, which was a much more time-consuming endeavor back then. For example, California—one of the first states to enact such a law, in 1923—initially imposed a one-day wait for retail handgun purchases, during which dealers were required to provide information identifying the purchaser to the local police or county clerk. *Silvester*, 843 F.3d at 823-24. New Jersey, another early adopter in 1927, imposed a seven-day waiting period similarly requiring the dealer to forward the purchaser's information to the licensing authority for a background investigation. *See* Law of Mar. 30, 1927, ch. 321, §6(4)(b), 1927 N.J. Laws 742, 746. The District of Columbia followed in 1932 with a 48-hour waiting period requiring

---

[1] The district court opinion in *Silvester v. Harris* was later reversed on other grounds on appeal, 843 F.3d 816 (9th Cir. 2016), but the Supreme Court abrogated the Ninth Circuit decision in *Bruen*, *see Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) (recognizing abrogation). Plaintiffs cite the *Silvester* district court and court of appeals opinions for the purposes of their historical analysis.

the dealer to forward the purchaser's information to the D.C. police within six hours. *See* Act of July 8, 1932, ch. 465, §8, 47 Stat. 650, 652. Three years after that, South Dakota passed its own 48-hour waiting period with a six-hour notification requirement. *See* Law of Mar. 14, 1935, ch. 208, §9, 1935 S.D. Laws 355, 357. In the 1970s, 1980s, and 1990s, waiting-period laws enjoyed a brief renaissance, as additional states sought to facilitate background checks in the pre-Internet era. *Silvester*, 843 F.3d at 824; *see also, e.g.*, *State v. Mendoza*, 920 P.2d 357, 368 (Haw. 1996) (Hawaii); S.B. 185, 1975-76 Leg., Reg. Sess. (Wis. 1975), https://tinyurl.com/3f8xr6uy (Wisconsin).

23. While these waiting periods helped facilitate investigations into the purchaser, they also came at a significant cost to law-abiding citizens. A New Jersey woman was fatally stabbed by her ex-boyfriend (against whom she had a restraining order) in 2015 while waiting for the state to process her application to own a handgun. Greg Adomaitis, *N.J. Gun Association Calls Berlin Woman's Death an 'Absolute Outrage'*, NJ.com (June 5, 2015), https://tinyurl.com/mn32h8f. In another sad episode, a Wisconsin woman was killed by her stalker before she could take possession of the handgun she was attempting to purchase. *See* Kopel, *supra*, at 309. These are not one-offs. As the Supreme Court recently reminded, "disarm[ing]" a citizen for "[e]ven [a] short period … can be deadly." *Wolford v. Lopez*, 609 U.S. 185, 204 (2026).

24. With the advent of modern federal background-check requirements and the National Instant Criminal Background Check System ("NICS"), waiting-period laws no longer serve an investigatory purpose, as over 90% of background checks are completed "within seconds to minutes." U.S. Dep't of Just., *NICS 2025 Operational Report* 6, https://perma.cc/TE2V-7Q7T. Many states that previously required waiting periods have accordingly abandoned them over the past few decades, in recognition of the severe costs they impose on the citizenry. *See, e.g.*, 1995

Or. Laws ch. 729, §13 (S.B. 1096) (Oregon); 1997 Ind. Legis. Serv. P.L. 17-1997 §§6, 8 (H.E.A. 1669) (Indiana; §6 repeals a seven-day waiting period while §8 adds an instant-background-check requirement); 2009 S.D. Sess. Laws ch. 122 §1 (SB 70) (South Dakota); 2015-2016 Wis. Legis. Serv. 22 (S.B. 35) (Wisconsin); *see also* Brendan O'Brien, *Wisconsin Governor Signs Bill Repealing Handgun Waiting Period*, Reuters (June 24, 2015), https://tinyurl.com/228uby2t (observing that "the instant national background check system makes the waiting period law obsolete," and quoting the then-Governor's remark that repealing the waiting-period law "allows Wisconsin's law to catch up with the 21st century"); Tenn. Bur. Invest., *Guidelines for Federal Firearms Licensees* 1-2, https://perma.cc/HA2X-VMM5 (noting that Tennessee's "fifteen-day waiting period between purchase and delivery of a handgun was eliminated effective November 1, 1998," the same day "[t]he Tennessee Instant Check Law became effective").

25. Federal law followed a similar trajectory. Congress initially mandated background checks for most firearm sales in the Brady Handgun Violence Prevention Act of 1993. Although the Brady Act contemplated a nationwide system of instant background checks, the technology necessary to facilitate that system did not yet exist when Congress passed the law. So the Brady Act gave the FBI five years to lay the groundwork for what ultimately became NICS, and, in the meantime, Congress embraced a five-day waiting period to facilitate local law enforcement officials conducting cumbersome background checks. *See Printz v. United States*, 521 U.S. 898, 902-04 (1997). But mindful of the constitutional concerns with that approach, Congress abandoned the five-day waiting period once NICS came online and replaced it with an affirmative protection to ensure that delays in processing the checks would not impede the lawful exercise of Second Amendment rights: A licensed firearms dealer may proceed with a sale three business days after requesting a background check, even if the background check has not yet been completed.

*See* 18 U.S.C. §922(t)(1)(B)(ii); *see also* U.S. Dep't of Justice, *Presale Handgun Checks, the Brady Interim Period, 1994-98* (revised June 2000), https://tinyurl.com/2nrdckfs.

26. While Congress and some states with waiting periods responded to the advent of NICS and related improvements to background-check processes by abandoning lengthy waiting-period laws, a handful of others responded by trying to re-justify laws originally intended to facilitate a background check. California is illustrative. After adopting a one-day waiting period for retail sales of pistols, revolvers, and concealable firearms in 1923, California extended the period to five days in 1965, and then again to 15 days in 1975, both times primarily "to allow more time for more extensive background checks." *Silvester*, 843 F.3d at 824. It was not until 1979 that the state even hinted (as a litigating position) that the law might serve a "cooling off" function too. *See People v. Bickston*, 154 Cal.Rptr. 409, 410-11 (Cal. App. Dep't Super. Ct. 1979). And the California legislature did not expressly embrace a cooling-off approach until 1996. *Silvester*, 41 F.Supp.3d at 946-47. By then, California had switched to an electronic background check system that allowed most checks to be processed far more expeditiously than previously. Although the legislature apparently recognized at that point that it no longer had a good justification to force Californians to wait 15 days to acquire a firearm, it still was not willing to trust law-abiding citizens who have passed a background check with a firearm. (Indeed, at the time, California was not even willing to admit that the Second Amendment protects an individual right to keep and bear arms.) So, California reduced its waiting period, but only to ten days, contending that law-abiding citizens should have to wait out a "'cooling off' period" before they can acquire a handgun, even if they have already passed the requisite background check. *Id.* at 947.

27. The Ninth Circuit upheld California's cooling-off law under the means-end balancing test it previously applied in Second Amendment cases. *Silvester*, 843 F.3d at 827-29.

But *Bruen* subsequently rejected any role for means-end balancing in the Second Amendment context, abrogating the Ninth Circuit's decision and others applying similar tests. 597 U.S. at 22-23.

**II. HB129 Mandates A Seven-Day Cooling-Off Period On Nearly All Firearm Purchases.**

28. In addition to emphatically rejecting means-end balancing, *Bruen* explicitly cautioned states not to erect ahistorical laws with the sole purpose and effect of delaying law-abiding citizens' ability to carry a firearm. *See, e.g.*, 597 U.S. at 38 n.9.

29. To their credit, some states with early waiting-period laws still on the books have heeded that warning, acknowledging that delaying arms-bearing conduct for no valid investigatory purpose is fundamentally inconsistent with the Framers' decision to entrust law-abiding citizens with firearms. *See, e.g.*, Offer of Judgment 3, *Dunn v. Glass*, No. 8:25-cv-02264 (M.D. Fla. June 5, 2026), Dkt.45-1 (conceding that Florida's three-day waiting-period law violates the Second Amendment). After all, our regulatory tradition has always distinguished between permissible efforts to keep firearms out of the hands of "citizens who have been found to pose a credible threat to the physical safety of others" (like background checks) and impermissible efforts to "broadly restrict arms use by the public generally" (like cooling-off periods). *United States v. Rahimi*, 602 U.S. 680, 692, 698, 700 (2024).

30. But New Mexico took a decidedly different path. In 2024, for the first time in its history, New Mexico joined California and the handful of other states with cooling-off laws by passing HB129.

31. HB129 requires "[a] waiting period of seven calendar days … for the sale of a firearm and the transfer of the firearm to the buyer." N.M. Stat. §30-7-7.3(A). Although the statute's primary stated purpose is "reduc[ing] impulsive gun violence or suicides," *Ortega*, 148 F.4th at 1140, the seven-day period is not keyed to the time it takes to complete a background

check into someone's criminal and mental health history. HB129 instead specifies that "[t]he seven-calendar-day waiting period shall include the period required to conduct a federal instant background check." N.M. Stat. §30-7-7.3(A). So even if the background check is resolved "within seconds to minutes," as over 90% are, the purchaser must still wait seven days. U.S. Dep't of Just., *NICS 2025 Operational Report*, *supra*, at 6. HB129 also purports to supersede the maximum-three-business-day delay under federal law, prescribing that "if the seven-calendar-day waiting period has expired without the completion of a required federal instant background check, the seller shall not transfer the firearm to the buyer until the federal instant background check is completed" or until "twenty days" have gone by. N.M. Stat. §30-7-7.3(A). *But see* 18 U.S.C. §922(t)(1)(B)(ii); *supra* ¶25.

32. Transferring a firearm in violation of HB129 is a misdemeanor for both the buyer and the seller. *See* N.M. Stat. §30-7-7.3(D), (G). The only sales exempt from the cooling-off period are sales to federally licensed firearms dealers, sales to people with valid New Mexico concealed handgun licenses, sales to law-enforcement agencies or between law-enforcement officers, and sales between immediate family members. *See id.* §30-7-7.3(H).

## III. The Tenth Circuit Has Declared HB129 "Obviously Unconstitutional" As Applied To Individuals Who Pass A Background Check.

33. Law-abiding New Mexicans reacted to this obvious infringement on their constitutional rights by promptly filing a lawsuit. *See Ortega*, 148 F.4th at 1140. And the Tenth Circuit promptly agreed that HB129 is "obviously unconstitutional" as applied to individuals who pass the background check required by federal law. *Id.* at 1155 n.16.

34. As the Tenth Circuit explained, laws that "prevent[] a [law-abiding] citizen from possessing a firearm for a flat period" do not merely impose a condition or qualification on commercially firearm sales; they "burden the right to keep and bear arms" and are thus

presumptively unconstitutional under *Bruen*. *Id.* at 1143-48. And HB129 does not "fit[] within" America's "historical tradition of firearm regulation," as cooling-off laws are a thoroughly "modern innovation" with no historical analogue whatsoever. *Id.* at 1149-50 (quoting *Rahimi*, 602 U.S. at 691). While New Mexico invoked "intoxication laws[,] license and permitting regimes[,] and targeted group bans on firearm carry of possession," *id.* at 1150, as well as historical surety laws, *see id.* at 1151 n.11, the Tenth Circuit held that those historical laws were not "relevantly similar" in "the 'why' and 'how' they regulate firearms," *id.* at 1149-54. So the Tenth Circuit "remand[ed] to th[is] district court[] with instructions to enter" injunctive relief. *Id.* at 1156; *see also Ortega*, 162 F.4th 1056 (denying New Mexico's petition for en banc review).

35. After another round of summary judgment briefing—during which New Mexico brazenly urged Judge Browning to uphold HB129 "notwithstanding" the Tenth Circuit's opinion, *Ortega*.D.Ct.Dkt.109 at 28—Judge Browning entered final judgment in favor of the plaintiffs, who had requested both injunctive and declaratory relief. *See, e.g.*, *Ortega*.D.Ct.Dkt.1 at 8; *see also Ortega*.D.Ct.Dkt.120 at 7.

36. That order constitutes a final determination of HB129's constitutionality to which the Attorney General is bound as a named party. While the Attorney General has appealed that judgment, that judgment—and the Tenth Circuit's opinion preceding it—conclusively resolves HB129's (un)enforceability unless and until the Tenth Circuit overrules *Ortega*.

37. In the wake of Judge Browning's order, New Mexico not only has appealed, but has taken the remarkable position that it will continue to enforce HB129 in state court against every New Mexico firearms retailer and every New Mexican except Samuel Ortega and Rebecca Scott (i.e., the two named plaintiffs in *Ortega*). The state's multiple public statements to that effect prompted a flurry of inquiries to NSSF, NRA, SAF, NMFIA, and NMSSA from their respective

memberships seeking guidance about their rights and responsibilities under New Mexico law.

38. Hoping to avoid further litigation, undersigned counsel, who also represent the plaintiffs in *Ortega*, reached out to the state's counsel of record in that case to inquire whether New Mexico would be willing to stand down in light of the Tenth Circuit's and Judge Browning's holdings as to HB129's (un)constitutionality. In response, the state's counsel of record informed undersigned counsel that it is New Mexico's position that it can and will enforce HB129 against everyone but Samuel Ortega or Rebecca Scott. Plaintiffs thus were left with no choice but to bring this lawsuit seeking relief on behalf of their members.

**CLAIM FOR RELIEF**
**Second Amendment Violation**
**42 U.S.C. §1983**

39. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as though fully set forth herein.

40. "The Second Amendment protects the right of 'all Americans' to keep and bear firearms for self-defense." *United States v. Hemani*, 608 U.S. 772, 779 (2026) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008)); *see* U.S. Const. amend. II (securing "the right of the people to keep and bear Arms"); *see also McDonald v. Chicago*, 561 U.S. 742 (2010) (holding that the Second Amendment is incorporated against the states via the Fourteenth Amendment).

41. Because "the Second Amendment was designed to codify a 'pre-existing' individual right and guard against its later erosion by majoritarian legislation or judicial fiat," a state must justify any law that regulates that conduct by demonstrating that it is "consistent with th[e] Nation's historical tradition of firearm regulation." *Hemani*, 608 U.S. at 780 (quoting *Bruen*, 597 U.S. at 24-25). To do so, a state must show that the challenged restriction is "relevantly similar" "in purpose and operation" to "'well-established'" historical analogues. *Id.* (quoting *Bruen*, 597 U.S. at 28-30); *see Rahimi*, 602 U.S. at 692, 699. Under that rubric, "the more a

modern law diverges from traditional laws in purpose and operation, the less likely it is to survive review." *Hemani*, 608 U.S. at 780-81.

42. HB129 prevents law-abiding citizens from taking possession of the firearms they wish to keep and bear for 7 days. It therefore restricts arms-bearing conduct covered by the plain text of—and "presumptively protect[ed]" by—the Second Amendment. *Bruen*, 597 U.S. at 17. Indeed, HB129 prevents nearly everyone in the state ("the people") from taking possession of (and thus "keep[ing] and bear[ing]") a firearm ("Arms") for seven days, even if they pass a background check instantly. The requirement that "the challenged law fall within the plain text of the Second Amendment" is thus "easily met" here, as HB129 "burdens those wishing to exercise their Second Amendment right." *Wolford*, 609 U.S. at 201-02; *see Ortega*, 148 F.4th at 1143-45 (so holding).

43. No more is required to shift the burden to the state to justify its restriction on arms-bearing conduct. *See Wolford*, 609 U.S. at 201-05. Nevertheless, it is worth noting that the Tenth Circuit has already held that HB129 does not "impose a condition or qualification like other" longstanding commercial restrictions that may enjoy a presumption of validity in light of their pedigree. *Ortega*, 148 F.4th at 1147. Laws that simply prohibit the transfer of a firearm for a period of time—whether permanently or temporarily—do not impose a condition on the sale of arms at all. (In point of fact, *Black's Law Dictionary* explicitly defines the term "condition precedent" to exclude "a lapse of time." Condition, *Black's Law Dictionary* (12th ed. 2024) ("An act or event, *other than a lapse of time*, that must exist or occur before a duty to perform something promised arises." (emphasis added)). Said differently, a law that outright forbids a law-abiding citizen from taking possession of a firearm is a prohibition of, not a condition on, sale, regardless of how long the prohibition lasts—as the Tenth Circuit has already held. *Ortega*, 148 F.4th at 1147. What is more, the Tenth Circuit has also held that even if HB129 *were* considered a

presumptively lawful condition of commercial sale, any presumption of constitutionality would be rebutted, because a law "justified only by assuming that citizens cannot be trusted with their own rights[] is put toward an abusive end." *Id.* at 1148-49 & n.7; *see also Bruen*, 597 U.S. at 38 n.9.

44. Nor can New Mexico credibly argue otherwise. Unlike laws prohibiting sales to minors or prohibiting possession by felons, New Mexico's cooling-off law does not distinguish from the general public *either* people found to pose a threat based on individualized conduct *or* a subset of people who as a class are thought particularly likely to act violently or impulsively. *Cf. Hemani*, 608 U.S. at 792 (finding inconsistent with historical tradition a restriction on possession that does not "confine[] its reach to those who are categorically and unusually dangerous"). Instead, HB129 "broadly restrict[s] arms use by the public generally," *Rahimi*, 602 U.S. at 698, based on the impermissible view that everyone who wants to exercise their Second Amendment rights should be treated with suspicion. *See Ortega*, 148 F.4th at 1150 n.10 ("To say that a desire to purchase a firearm renders one dangerous or presumptively not law-abiding for a time would also penalize someone for exercising a constitutional right, which is obviously unconstitutional."). As the Tenth Circuit and other courts have observed, if the state wants to disarm someone—even if only for a "limit[ed]" "time"—then it must establish "the defendant's current danger to others" through "individualized proof." *E.g.*, *United States v. Rose*, 180 F.4th 930, 932, 936 (7th Cir. 2026); *see also United States v. Daniels*, 101 F.4th 770, 778 (10th Cir. 2024) ("[I]f we are to take seriously the normative thrust of the Supreme Court's recent decision[s] …, then we cannot look with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way." (citation omitted)).

45. Finally, as the Tenth Circuit made clear beyond cavil, HB129 is inconsistent with the Nation's "historical tradition of firearm regulation." 148 F.4th at 1149-55. Indeed, the

historical record is so lopsided that Plaintiffs would prevail even if *they* bore the burden of proving that such laws are *not* consistent with historical tradition. There is no longstanding tradition in this country of forcing law-abiding citizens to wait to acquire firearms. To be sure, some historical laws sought to delay or prevent firearm acquisition by certain classes of individuals—whether they be people who were intoxicated (for obvious reasons), people subject to individualized determinations of dangerousness (also for obvious reasons), or people comprising disfavored minorities (for obviously odious reasons). But none of those laws imposed the sort of population-wide burden on keeping and bearing arms that HB129 foists on all New Mexicans. Likewise, while some states adopted waiting-period laws in the early- and mid-twentieth century, those laws were imposed to facilitate background checks or other investigatory efforts to determine whether someone is prohibited from possessing a firearm. Unadorned cooling-off laws such as HB129, by contrast, are not tethered to any such efforts; they simply delay the exercise of Second Amendment rights for the sake of delay, on the theory that even law-abiding citizens who have passed a background check cannot be trusted with a firearm. So even assuming that twentieth-century waiting-period laws designed to facilitate background checks could be justified on the basis of a tradition that requires individuals to demonstrate their law-abiding character before taking possession of an arm, cooling-off laws—which did not come about for nearly another half century—not only address a fundamentally different "how" and "why," but are fundamentally incompatible with the Second Amendment.

46. Because HB129 is not "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, it violates the Second Amendment.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendant and provide the following relief:

1. an order declaring that HB129 violates the Second Amendment as applied to all law-abiding citizens who pass a background check in less than 72 hours;

2. an order preliminarily and permanently enjoining Defendant and those subject to his supervision, direction, or control from enforcing HB129 against Plaintiffs, Plaintiffs' customers, and Plaintiffs' members;

3. an award of costs and attorneys' fees pursuant to 42 U.S.C. §1988 and any other applicable statute or authority; and

4. any other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

s/Carter B. Harrison IV
Carter B. Harrison IV
**Harrison & Hart, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
(505) 295-3261
carter@harrisonhartlaw.com

Michael D. McCoy*
**Mountain States Legal Foundation**
2596 South Lewis Way
Lakewood, CO 80227
(303) 292-2021
mmccoy@mslegal.org

Erin E. Murphy*
Matthew D. Rowen*
Kevin Wynosky*
**Clement & Murphy, PLLC**
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com
kevin.wynosky@clementmurphy.com

***Attorneys for Plaintiffs***

* *pro hac vice* applications forthcoming

October 19, 2026